## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MARK E. HOLLIDAY, in his capacity as Liquidating Trustee for the GOK Liquidating Trust, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Case No. _____ |
| DAVID J. CROWLEY, JEFFREY L. GATES, GARY E. JONES, RANDALL STAFFORD, JESSICA PALOMINO, JAMES BOGARDUS, MICHAEL MUSE, FRANCISCO GRAS, RICHARD CIESLEWICZ, JAMES TASTARD, and GATES CAPITAL MANAGEMENT, and as Notice Parties: PIONEER UNDERWRITERS, STARSTONE US SERVICES, QBE SPECIALTY INSURANCE COMPANY, ANV GLOBAL SERVICES, INC., and NAVIGATORS INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY DEMANDED** |
| Defendants. | ) ) ) | |

## COMPLAINT

Mark E. Holliday, in his capacity as Liquidating Trustee ("**Liquidating Trustee**" or

"**Plaintiff**") for the GOK Liquidating Trust ("**Liquidating Trust**") established pursuant to the

confirmed and effective First Amended Joint Plan of Liquidation in the chapter 11 cases filed by

Geokinetics Inc. and its affiliated companies (collectively the "**Company**" or "**Debtors**") in the

United States Bankruptcy Court for the Southern District of Texas, lead case number 18-33410,

by and through his undersigned counsel, files this Complaint against David J. Crowley, Jeffrey L.

Gates, Gary E. Jones, Randall Stafford, Jessica Palomino (Crowley, Gates, Jones, Stafford, and

Palomino, collectively the "**Board Member Defendants**"), James Bogardus, Michael Muse,

Francisco Gras, Richard M. Cieslewicz, James Tastard (Bogardus, Muse, Gras, Cieslewicz, and Tastard, collectively the "**Officer Defendants**"[1] and together with the Board Member Defendants, collectively the "**Individual Defendants**"),[2] and Gates Capital Management ("**GCM**" or the "**Lender Defendant**," and collectively with the Individual Defendants, the "**Defendants**"), with the following entities named as notice parties: Pioneer Underwriters ("**Pioneer**"), Starstone US Services ("**Starstone**"), QBE Specialty Insurance Company ("**QBE**"), ANV Global Services, Inc. ("**ANV**"), and Navigators Insurance Company ("**Navigators**") (Pioneer, Starstone, QBE, ANV, and Navigators, collectively the "**Insurers**").  The Liquidating Trustee, based on knowledge, information and belief, and as a result of his investigation to date, alleges as follows:

## PRELIMINARY STATEMENT

1.      The Board Member Defendants and Officer Defendants drove the Company to chapter 11 liquidation in the summer of 2018 by failing to address its chronic and deepening liquidity problems that began in 2014 with the global downturn in oil prices.  This failure is primarily attributable to the overbearing influence of self-dealing, biased members of the Company's board of directors (the "**Board**") with no experience in the oil and gas industry.  The decisions of the Board Member Defendants and the Officer Defendants, primarily by rubber-stamping the dictates imposed by these conflicted Board members, directly led to the deepening

---

[1] Although the Company had other officers, the Officer Defendants were the senior officers of the Company entrusted with ultimate decision making authority for the Company's corporate strategy.  That is why these specific officers are named as Officer Defendants.

[2] For the avoidance of doubt, although the Individual Defendants are named in this lawsuit, the Individual Defendants (other than Muse, Gates, and Jones) are named solely in their capacity as insureds and this lawsuit is being initiated to collect on the insurance proceeds of the directors and officers liability policies held by the Company.  Plaintiff does not seek to collect damages directly from any insured Individual Defendant (other than Muse, Gates, and Jones), but solely from the insurance policies.  Under the Company's liquidating chapter 11 plan, releases of personal liability were provided to all Board Member and Officer Defendants who held such positions as of the date the Company's bankruptcy petition was filed but allowed for the Plaintiff to collect on insurance proceeds for any claims involving such released persons.  Muse, Gates, and Jones were not Board members or officers as of the petition date and, thus, are not covered by the release in the plan and may be sued in both their individual capacities and as insureds.

insolvency and ultimate collapse of the Company.  Through this proceeding, the Plaintiff is seeking to hold those parties responsible for their part in tanking the Company and return some of the money attributable to their missteps back to the Company's creditors.

2.      The Company was a full-service global provider of seismic data acquisition, processing, and integrated reservoir geosciences services to the oil and natural gas industry.  At the height of its business operations, the Company operated in over 20 countries and 6 continents. The Company was primarily composed of three business divisions: (1) proprietary seismic where the Company would go out and do seismic work in the field; (2) a multi-client library ("**MCL**") of seismic data collected over the years for customers that the Company owned and had the ability to sell the data to customers; and (3) data processing where the Company would process seismic data for internal or client purposes.  The Company operated throughout the oil-producing countries of the world, including Malaysia and Brazil, among others.

3.      The events that led to this action began with the Company's emergence from a prior chapter 11 bankruptcy case.  In 2013, due to a downturn in drilling and exploration activity, the Company filed for protection under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").  This bankruptcy case was resolved through a pre-packaged plan that resulted in two of the Company's primary investors acquiring substantial control over the Company.  Specifically, Ascribe II Investments, LLC ("**Ascribe**")[3] and GCM took three seats on the Company's five-member board.  These seats were initially held by Lawrence "Larry" First of Ascribe, Evan Middleton of Ascribe, and Jeffrey Gates of GCM.  Evan Middleton would later be

---

[3] An affiliate of American Securities, LLC.

replaced by Anthony Grillo and then Ross Solomon, also of Ascribe.[4]  The Ascribe and GCM directors shall collectively be referred to as the "**Conflicted Members**."

4.       As investors first, and board members second, the Conflicted Members were primarily focused on the success of their own investments and businesses, and not the successes of the Company.  To this end, the Conflicted Members, primarily the Ascribe members, promoted and obtained approval for a number of questionable actions that simultaneously hurt the Company while benefitting the Conflicted Members.  These improper actions included, among others: (i) consolidating the Company's senior secured debts in the sole hands of Ascribe; (ii) hiring conflicted corporate counsel for the Company that also represented Ascribe; (iii) unilaterally dictating what projects the Company would and would not pursue; (iv) hamstringing the Company's officers' ability to incentivize key employees; and (v) abandoning the Company's most lucrative asset through a questionable sale of the MCL on the eve of the current bankruptcy case, the proceeds of which solely benefitted Ascribe.[5]  The culmination of these actions led to, in the words of independent Board Member Jones, a "de facto" exit of both the Company's marine and international land businesses.  *See* Emails from Gary Jones to David Crowley dated April 5 & 6, 2018, true and correct copies of which are attached hereto as **Exhibit 1**.  In the end, only a shell of the Company remained and liquidation, as opposed to restructuring and continuing as a going concern, was the only option.

5.       The key Conflicted Member was Larry First of Ascribe.  Mr. First, through his control of Ascribe and the other Ascribe-associated Conflicted Members, effectively held control

---

[4] Ascribe obtained a full release of all claims against both it and its members in the Company's chapter 11 bankruptcy case and, as such, neither Ascribe, Mr. First, nor any of the other Ascribe Board members can be named as defendants in this lawsuit.

[5] Even if it is later shown that the funds were ultimately paid to Wells Fargo and not Ascribe, Ascribe orchestrated the transaction to coincide with its acquisition of complete control over the credit facility for which Wells Fargo was agent, so the benefit nevertheless ran to Ascribe, and not the Company.

over all Board actions. Utilizing his connection with Fried Frank (the firm at which he had previously been a Partner) who represented Ascribe in the 2013 bankruptcy—and thereafter somehow represented both Ascribe and the Company simultaneously—Mr. First dictated the decisions of the Board through unilaterally making all strategic decisions. Once Mr. First had made a decision, he would then dictate it to Mr. Crowley to obtain his "approval." The two of them would then propose Ascribe's pre-approved course of action to the remaining Board Member Defendants, just prior to the action being called to a vote. The remaining Board Member Defendants would then approve the Ascribe directives, with little to no lead time and no ability to fully inform themselves of the advisability of the actions. This practice gave Ascribe complete control over the Company's strategic decisions, with the remaining Board Member Defendants rubber-stamping the Ascribe-proposed actions. In fact, the Board never took any action contrary to the wishes of Ascribe and Mr. First.[6]

6.      As Ascribe was increasingly dictating the decisions of the Board, the Company was facing increasing liquidity problems. As early as 2014, when the global price for oil fell drastically, the Company was struggling to maintain sufficient operational liquidity. Both the Board Member Defendants and Officer Defendants failed to successfully resolve these liquidity problems over the next three years. Although attempts were made to address the liquidity crisis, such attempts all failed—largely contributable to the flawed and dysfunctional operation of the Board and the actions of the Officer Defendants. Eventually, Ascribe was able to orchestrate a

---

[6] When asked to name every example of when the Board went against the wishes of Ascribe, Mr. Crowley could only provide one: Mr. Crowley approved mobilization in Malaysia with global company Petronas prior to the execution of a written contract against Ascribe's wishes. *See* Deposition Transcript of David Crowley dated May 26, 2020 ("**Crowley Dep. Tr.**"), attached hereto as **Exhibit 2**, 39:4–41:18. While the Company did, in fact, mobilize prior to the execution of the Petronas contract, Ascribe nevertheless got its way regarding the Petronas deal by subsequently directing the Company to renegotiate its contract with Petronas—a tactic that Mr. Jones stated would result in the Company being blacklisted in the marine sector. *See* **Ex. 1** (recognizing that the Board approved directive of Ascribe and GCM to renegotiate Petronas contract, even though such action would likely result in a de facto exit from the marine business).

simultaneous transaction whereby Ascribe became the sole holder of the Company's credit facility debt so that it could divert the proceeds from the sale of the Company's most valuable asset—the MCL—directly to Ascribe.  Despite the purpose of raising desperately needed cash to fund the Company's operations, the end-result of this sale provided no new liquidity to the Company, no new potential work, and only benefitted Ascribe, who was now completely controlling the ship.

7.     By approving the flawed MCL sale, the Board effectively guaranteed the Company's bankruptcy filing.  Indeed, the purchaser of the MCL was clearly cognizant of the inevitability of the Company's bankruptcy, as it required atypical provisions related to a potential bankruptcy filing—which Fried Frank approved—in the purchase documents. When combined with the Board's other actions and inactions in failing to address the Company's liquidity crisis earlier, the actions of the Company's Board Member Defendants and Officer Defendants resulted in the deepening insolvency of the Company, the end-result of which was a liquidating chapter 11 bankruptcy.  The Conflicted Members mandated the actions that led to the Company's demise. The remaining Board Member Defendants and Officer Defendants kowtowed to the Conflicted Members' demands.  And the Company and its creditors paid the price.

## PARTIES

8.     Plaintiff Mark E. Holliday is the Liquidating Trustee for the Debtors' Liquidating Trust established pursuant to the confirmed and effective First Amended Joint Plan of Liquidation in the above-captioned chapter 11 cases.

9.     Defendant David J. Crowley has served as a Director and President and CEO of the Company since 2014.  He also served on the Board of Directors for this entire tenure.  Upon information and belief, Mr. Crowley is a resident of Texas and can be served process at 3803 Louvre Ln, Houston, TX 77082.

6

10.     Defendant Jeffrey L. Gates is the Managing Partner of Gates Capital Management and has served as on the Board as a Director of the Company since 2014. Upon information and belief, Mr. Gates is a resident of New York and can be served process at 88 Central Park West, Apt 9, New York, NY 10023.

11.     Defendant Gary E. Jones has served as an independent member of the Company's Board of Directors since 2014.  Upon information and belief, Mr. Jones is a resident of Arizona and can be served process at 7182 N Finger Rock Pl, Tucson, AZ 85718.

12.     Defendant Randall Stafford served as General Counsel and Vice President of the Company from November 2013 through June 2016.  Upon information and belief, Mr. Stafford is a resident of Texas and can be served process at 50 Hollingers Is., Katy, TX 77450.

13.     Defendant Jessica Palomino has served as General Counsel and Secretary for the Company's Board of Directors since June 2016.  Upon information and belief, Ms. Palomino is a resident of Texas and can be served process at 5318 Feagan St, Houston, TX, 77007.

14.     Defendant James Bogardus has served as Executive Vice President for Processing, Reservoir and Multi-Client Services for the Company since February 2010.  Upon information and belief, Mr. Bogardus is a resident of Texas and can be served process at 2330 Glen Haven Blvd, Houston, TX 77030.

15.     Defendant Michael Muse served as Executive Vice President and Chief Financial Officer of the Company from August 2015 through April 2018.  Upon information and belief, Mr. Muse is a resident of Texas and can be served process at 17502 Stonebrook Run Ct, Tomball, TX 77375.

16.     Defendant Francisco Gras served as interim Chief Financial Officer from April 2018 through June 2018.  Upon information and belief, Mr. Gras is a resident of Texas and can be served process at 6322 Grovewood Ln, Houston, TX 77008.

17.     Defendant Richard M. Cieslewicz served as Senior Vice President for International Operations and Operations Support for the Company from March 2015 through early 2017, when he transitioned to Executive Vice President of Operations for the Company, the position which he held until he left the Company in 2018.  Upon information and belief, Mr. Cieslewicz is a resident of Texas and can be served process at 4819 Bell Mountain Dr, Katy, TX 77494.

18.     Defendant James Tastard served as Senior Vice President and Chief Human Resources Officer from July 2017 through July 2018.  Upon information and belief, Mr. Tastard is a resident of Texas and can be served process at 11826 Legend Manor Dr, Houston, TX 77082.

19.     Defendant GCM is a Delaware Corporation that can be served process through its registered agent The Prentice-Hall Corporation System, Inc., 251 Little Falls Dr., Wilmington, DE 19808.

20.     Upon information and belief, Defendant Pioneer is a London-based insurance underwriting company that can be served process through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.  Pioneer is an insurance company that issued a policy to the Company providing coverage to the Individual Defendants for liability arising from the breaches of fiduciary duty described in this Complaint.  This policy was in full force and effect at certain times that the claims set forth herein against the Individual Defendants arose and Pioneer received notice of the claims.

21.     Upon information and belief, Defendant Starstone is a Delaware insurance company and can be served process through its registered agent The Corporation Trust Company,

Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.  Starstone is an insurance company that issued a policy to the Company providing coverage to the Individual Defendants for liability arising from the breaches of fiduciary duty described in this Complaint.  This policy was in full force and effect at certain times that the claims set forth herein against the Individual Defendants arose and Starstone received notice of the claims.

22.     Upon information and belief, Defendant QBE is an Australia-based insurance company that can be served through its registered agent C T Corporation System, 28 Liberty St, New York, NY 10005.  QBE is an insurance company that issued a policy to the Company providing coverage to the Individual Defendants for liability arising from the breaches of fiduciary duty described in this Complaint.  This policy was in full force and effect at certain times that the claims set forth herein against the Individual Defendants arose and QBE received notice of the claims.

23.     Upon information and belief, Defendant ANV is an international insurance company with its United States headquarters in New Jersey that can be served through its registered agent Corporation Service Company, 80 State Street, Albany, New York, 12207-2543. ANV is an insurance company that issued a policy to the Company providing coverage to the Individual Defendants for liability arising from the breaches of fiduciary duty described in this Complaint.  This policy was in full force and effect at certain times that the claims set forth herein against the Individual Defendants arose and ANV received notice of the claims.

24.     Upon information and belief, Defendant Navigators is an insurance company affiliated with the Hartford insurance company and may be served through its registered agent Corporation Service Company, 80 State Street, Albany, New York, 12207-2543.  Navigators is an insurance company that issued a policy to the Company providing coverage to the Individual

9

Defendants for liability arising from the breaches of fiduciary duty described in this Complaint. This policy was in full force and effect at certain times that the claims set forth herein against the Individual Defendants arose and Navigators received notice of the claims.

## JURISDICTION, VENUE & STANDING

25.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1334.

26.     Venue is proper in this judicial district under 28 U.S.C. § 1409.

27.     This action relates to *In re Geokinetics*, Chapter 11 Case No. 18-33410, pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

## DUTIES OF THE INDIVIDUAL DEFENDANTS

28.     By reason of their positions as board members and officers of the Company and because of their ability to control the business and corporate affairs of the Company, the Board Member Defendants owed a duty of loyalty to the Company and its stakeholders, which required that they not use their position of trust and confidence to further their own self-interests or the interests of affiliates or related persons, and that they act in the best interest of the Company.

29.     The Conflicted Members abused their power over the Board to promote their own self-interests to the detriment of the Company.  By dictating transactions that benefitted themselves while simultaneously failing to address the chronic and deepening insolvency of the Company, the Conflicted Members breached their fiduciary duty of loyalty to the Company.

30.     The other Board Member Defendants acquiesced to the mandates of the Conflicted Members, particularly the directives of the Ascribe board members.  By doing so, they allowed

the interests of the Conflicted Members to dictate the Company's actions, thus breaching their duty of loyalty to the Company.

31.     The Board Member Defendants also owed a fiduciary duty of care to the Company and its stakeholders.  This duty required that the Board Member Defendants make informed decisions on behalf of the Company to ensure that the Company's actions were truly in its best interests.  The Board Member Defendants who took directives from the Ascribe members and Mr. Crowley failed to properly vet these directives prior to approving them.  By rubber-stamping the actions mandated by Ascribe, the Board Member Defendants breached their fiduciary duty of care to the Company.

32.     Both the Board Member Defendants and Officer Defendants owed a duty of good faith to the Company.  This duty required the Board Member Defendants and Officer Defendants to act in the best interests of the Company.  The Board Member Defendants and Officer Defendants were aware of the Company's liquidity problems from as early as 2014.  Rather than work to find a solution that was in the best interests of the Company, including filing bankruptcy substantially earlier than June 2018 to preserve the Company as a going concern, the Board Member Defendants and Officer Defendants implemented ineffective strategies at the direction of the Conflicted Members that never increased liquidity.

33.     After nearly four years of liquidity problems and impending insolvency, the Company found itself on the verge of bankruptcy, needing an immediate cash infusion.  Rather than approve a proposed sale of the MCL that would provide the Company with more than $12 million in much-needed cash, as well as future projects that would provide stability and continued cash flow, the Board Member Defendants and Officer Defendants approved a transaction that netted **<u>zero dollars</u>** to the Company.  The only party that benefitted from the sale of the MCL, the

11

last gasp effort to save the Company, was Ascribe.  And the Board Member Defendants and Officer Defendants approved that sale.  In doing so, the Board Member Defendants and Officer Defendants ensured the Company's demise—a potentially avoidable consequence, if the interests of Ascribe were placed behind the interests of the Company.  But they were not.  And the Company died.

## FACTUAL BACKGROUND

### I.     Procedural History.

34.     On June 25, 2018 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On June 26, 2018, the Court entered an order directing joint administration of the Debtors' chapter 11 cases (collectively, the "**Bankruptcy Case**").

35.     By order dated October 19, 2018 (the "**Confirmation Order**"), the Court confirmed the Debtors' First Amended Joint Plan of Liquidation (the "**Plan**") [ECF No. 454].

36.     The effective date of the Plan (the "**Effective Date**") occurred on October 31, 2018.

37.     Pursuant to the Plan, Confirmation Order, and the Liquidating Trust Agreement associated therewith, the Liquidating Trustee was duly appointed to administer the Liquidating Trust.

### II.    The Company's Corporate Structure.

38.     Geokinetics, Inc., the corporate parent of all the other Debtors, was a privately-held Delaware corporation based in Houston, Texas, incorporated on January 31, 1980.  Attached as **Exhibit 3** is an organizational chart of Geokinetics and its subsidiaries.

39.     The Debtors provided a suite of geophysical services and generated their primary source of cash from seismic data acquisition and seismic data processing and integrated reservoir

geosciences segments, issuance of debt and equity securities, equipment financing, and trade credit.

**III.      The Company's Pre-Petition Capital Structure.**

40.      The Company's pre-petition capital structure consisted primarily of two secured financing facilities—a revolving credit agreement and term secured loan, as described more fully herein.

41.      On May 10, 2013, Geokinetics, Inc. and certain affiliates, as borrowers, and Wells Fargo Bank, National Association ("**Wells Fargo**") as administrative agent and collateral agent, and the other lenders party thereto, entered into a Loan and Security Agreement (as modified, amended, or supplemented from time to time, the "**Revolving Credit Agreement**").  A copy of the Revolving Credit Agreement is attached hereto as **Exhibit 4**. The Pre-Petition Revolving Credit Agreement was secured by liens on substantially all of the Debtors' real property, as well as all of the Debtors' cash, accounts receivable, inventory, intangibles, and fixed assets.

42.      On June 30, 2016, the Company entered into a Term Loan and Security Agreement (the "**Term Loan**") with Wilmington Trust as administrative agent and Wells Fargo as collateral agent, as amended from time to time.  Ascribe was the largest of the second lien lenders under the Term Loan.

43.      Wilmington Trust also acted as *pari passu* collateral agent to an Intercreditor Agreement, dated June 30, 2016 (as amended, supplemented or otherwise modified as of the Petition Date, the "**Intercreditor Agreement**") that sets forth, among other things, the relative lien priorities and other rights and remedies with respect to the security interests and liens on all or substantially all of the Debtors' assets.

44. Ascribe was the largest equity holder of the Company, holding roughly 49% of the Company's outstanding equity. GCM was the second-largest holder of the Company's second-lien debt.

### IV.  Events Leading to the Commencement of Chapter 11 Cases.

#### a.  The Company's Prior Bankruptcy Cases.

45. In the early part of the last decade, a sustained period of low drilling and production activity, largely driven by the prolonged decline of commodity prices, adversely affected the Company's operating results. As a capital-intensive business with high levels of fixed costs and narrowing operational margins, the market downturn exacerbated the Company's deteriorating financial position.

46. After efforts to address these financial problems failed, the Company filed for chapter 11 protection on March 10, 2013, commencing Case No. 13-10472-KJC before the United States Bankruptcy Court for the District of Delaware (the "**First Bankruptcy Case**").

47. On April 25, 2013, the Company confirmed a pre-packaged chapter 11 plan of reorganization, which equitized over $300 million of debt and paid off the Company's revolving credit facility. *See* First Bankruptcy Case, [D.I. 280].

48. The result of the equitization of the Company's debt was that Ascribe became the largest equity holder in the Company. *See* Transcript of Deposition Testimony of Jessica Palomino dated May 21, 2020 (hereinafter "**Palomino Dep. Tr.**"), at 13:21–14:4, attached here as **Exhibit 5**. After the conversion, Ascribe held roughly 49% of the Company's total equity shares.

14

49.    The Board for the newly reorganized Company consisted of David J. Crowley (President & CEO of the Company), Evan Middleton (affiliated with Ascribe)[7], Lawrence First (affiliated with Ascribe), and Jeffrey Gates (affiliated with GCM).

50.    Messrs. First, Middleton, and Gates had no experience in the oil and gas industry other than holding investments in this sector. *See* Crowley Dep. Tr., 33:18-25.

51.    Shortly thereafter, the Board elected Gary Jones as an independent Director for the Board.  Mr. Jones is a veteran of the seismic industry and was appointed to provide the Conflicted Members with an experienced perspective on the industry. *Id.*

52.    In 2014, Mr. Middleton resigned from the Board and Ascribe appointed Anthony Grillo as the second Ascribe Board member.  Upon information and belief, Mr. Grillo had no experience in the oil and gas or seismic industries prior to being appointed by the Board by Mr. First.

53.    In 2015, Mr. Grillo resigned from the Board and Ascribe appointed Ross Solomon as the second Ascribe Board member.  Mr. Solomon was in his twenties at the time he was appointed to the Board and had no experience in the oil and gas or seismic industries prior to being appointed to the Board by Mr. First. *Id.* at 35:11–36:2.[8]

**b.    <u>Ascribe Coordinated for Its Attorneys to Also Represent the Company.</u>**

54.    During the First Bankruptcy Case, both Ascribe and GCM were represented by the law firm of Fried, Frank, Harris, Shriver & Jacobson LLP ("**<u>Fried Frank</u>**"). *See* Palomino Dep. Tr., 21:25-26:2.

---

[7] At the time "American Securities."

[8] Due to Mr. First's control over Ascribe's board seats, the other Ascribe Board members simply followed along with the decisions and directives of Mr. First. Accordingly, any actions or decisions attributed to Mr. First or Ascribe herein are equally attributable to Messrs. Middleton, Grillo, and Solomon, respective to the years that each were on the Board.

55.     Mr. First is a former bankruptcy attorney who was a Partner at Fried Frank.  *See* Palomino Dep. Tr., 21:7-10.

56.     Following the First Bankruptcy Case, the Board made the decision to retain Fried Frank as counsel and continued with such representation through and including the months prior to the Petition Date.

57.     The Company's engagement letter with Fried Frank explicitly provided that it could continue to represent Ascribe and Gates while simultaneously representing the Company.  A true and accurate copy of the engagement letter with Fried Frank is attached as **Exhibit 6**.

58.     Fried Frank placed the interests of Ascribe above those of the Company.  For example, Fried Frank coordinated exclusively with Mr. First on several matters for the Company. Only after Fried Frank had worked these deals with Ascribe alone for a substantial time would Mr. First then present the deals to Mr. Crowley and, subsequently, the Board.  *See, e.g,* Emails dated November 18, 2015, true and correct copies of which are attached hereto as **Exhibit 7** (communications in which Fried Frank attorneys reach out to Mr. First alone about Company project and when Company's general counsel indicates he will reach out to Fried Frank, Mr. First responds "I need to talk to him first").

59.     Fried Frank's true allegiances were not lost on Randall Stafford, the former General Counsel of the Company, who noted in a transition letter to Ms. Palomino, the incoming General Counsel, that "[a]t no point should you forget that Fried Frank is Ascribe's Counsel, not the Company's."  A true and correct copy of the Transition Letter from Mr. Stafford to Ms. Palomino is attached hereto as **Exhibit 8**.

**c.  The Company Faced a Down Market Upon Emerging From Bankruptcy.**

60.     Upon emerging from the First Bankruptcy Case, the Company experienced operational difficulties stemming from a substantial downturn in the price of oil in the fourth quarter of 2014.

61.     When the price of oil drops, exploration and seismic activities, the lifeblood of the Company's business, is the first sector of the industry to be affected and the last sector to recover because oil companies tend to view such activities as discretionary. *See* Deposition Transcript of Richard Cieslewicz dated May 20, 2020 (hereinafter the "**Cieslewicz Dep. Tr.**"), attached hereto as **Exhibit 9**, at 19:20–20:9.

62.     This resulted in a downturn in the seismic market from the end of 2014 through 2018, when the Company again filed for bankruptcy.  Crowley Dep. Tr., 23:22-25.

63.     The Company took several steps to try and weather the downturn, including reducing its workforce, renegotiating its health care insurance costs, reducing 401k contributions, instituting a variable pay structure, and implementing tiered pay reductions.  Crowley Dep., 24:8–27:2.

64.     Despite these efforts, the Company was facing liquidity issues at the project level as early as 2016.  Crowley Dep. Tr., 53:17-24.

65.     During this time, the Board was growing increasingly fractured, with Crowley and Jones aligning, Ascribe continuing to assert its dominance, and Gates intermittently interjecting himself forcefully into the conversation with profanity-laced tirades and generally unprofessional behavior.

66.     Jones and Crowley exchanged numerous emails during this time detailing the "poor treatment" Crowley was receiving from Ascribe and the "adversarial and condescending" behavior

of Gates. *See* Emails between Gary Jones and David Crowley dated January 11, 2016 and July 12, 2016, true and correct copies of which are attached hereto as **Exhibit 10**.

67.     Meanwhile, Gates was consistently sending correspondence indicating that he was uninformed of the Company's strategies and generally frustrated with the Company's trajectory. *See, e.g.*, Emails from Jeff Gates to David Crowley dated November 18, 2015 (questioning "$34mm cash bleed" of international land operations) and June 28, 2017 (noting the Board's "fiduciary duty to stop the bleeding"), true and correct copies of which are attached hereto as **Exhibit 11**. Gates was not shy about expressing his opinion that Crowley was failing in his role as CEO and the dysfunctional nature of the Board. *See id.* (June 28, 2017 email in which Gates indicates that it was "past time for [Crowley] to act strategically"); *see also* Email from Jeff Gates to David Crowley dated March 27, 2018, a true and correct copy of which is attached hereto as **Exhibit 12** (stating that he would like to have a "functioning board again" more than once).

68.     As these fractures were growing, Ascribe, as the largest shareholder and holder of two Board seats, would utilize its position of power on the Board and its relationships with Fried Frank to initiate Company action without the consent of the Board. To this end, Mr. First would typically approve of a certain corporate action, have a unanimous written consent drafted and dictated to Mr. Crowley, and then the two of them would present the consent to the other Board Member Defendants for approval, with this consent often being the first time some, if not all, the remaining Board Member Defendants had seen the proposal. *See* Palomino Dep. Tr. 65:25–66:7.

69.     For example, and as discussed more fully below, in 2017, the Company hired Moelis and Company and FTI Consulting in connection with a potential sale of the MCL. Mr. Jones was not presented with the decision to hire these consultants for the sale of the Company's most valuable asset until after they had already been hired. *See* Email from Gary Jones to Jessica

Palomino dated December 21, 2017, a true and correct copy of which is attached hereto as **Exhibit 13**.

70.     Indeed, Ascribe's hold over the Board was so strong that it was viewed as having "veto power" over any decision made by the Board.  *See* Notes form the Meeting of the Boards of Directors of Geokinetics Inc. dated June 18, 2018, a true and correct copy of which is attached hereto as **Exhibit 14**, at 2 ("Mr. Crowley stated that as Mssrs. [sic] First and Solomon have veto rights they should be aware of the position the Company and GOK Brazil is in . . . .").

71.     By the end of 2017, Mr. Jones no longer viewed the Board as a "true governing body," but rather as a "shareholder committee, with the largest shareholder [Ascribe] working individually directly with management."  *See* **Ex. 13**.

72.     Throughout this spiraling liquidity crisis, Mr. Jones consistently felt that his input on the Board was either ignored or overlooked.  *See* **Ex. 10** (stating in January 11, 2016 email that his "input on compensation issues is either not solicited or ignored").  The dysfunctional nature of the Board and Conflicted Members' dominance of opinion eventually led Jones to step down from the Board in 2018.  In noting his reasons for his decision to leave the Board, Jones was unrestrained in detailing exactly how the Company's trajectory was going to lead to its demise.  Specifically, Mr. Jones warned the Directors that if the Conflicted Directors' proposed actions were forced to be adopted due to a withholding of funds, the actions would effectively result in a "de facto exit from the marine business" and "a de facto exit of the international business" and, if taken together in connection with the sale of the MCL, would be an unprecedented strategy that would significantly damage the Company.  *See*  **Ex. 1**.

     **d.**  **The Fairfield Transaction is Unanimously Approved by the Board Despite at Least Two Board Members Lacking Sufficient Information to Make an Informed Decision.**

73.    To try and address the Company's ever-deepening liquidity crisis, Mr. First proposed that the Company hire Moelis & Company ("**Moelis**") and FTI Consulting ("**FTI**") in July of 2017 to consult on strategic alternatives to bring liquidity to the Company. *See* Crowley Dep. Tr., 83:15–84:1.

74.    First fast-tracked this corporate decision, resulting in the Company hiring Moelis and FTI prior to obtaining the full consent of the Board. *See* **Ex. 13**.

75.    With the assistance of Moelis and FTI, the Company began what it referred to internally as "Project Echo." The goal of Project Echo was to raise capital for the Company, through a merger, consolidation, or otherwise. *See* Crowley Dep. Tr., 102:14-23.

76.    When the Company could not raise the capital through their originally stated plan, the Conflicted Directors shifted the focus of Project Echo from a capital raise effort to a sale of the MCL, a strategy that would only benefit the Ascribe and GCM. Crowley Dep. Tr., 103:2-4.

77.    In November 2017, Moelis began marketing the sale of the MCL. This effort culminated with the receipt of four offers, of which two bids from Fairfield Industries Incorporated ("**Fairfield**") and TGS were considered.

78.    The Fairfield offer included both cash and non-cash considerations, including roughly $8 million in cash, obtaining ownership of some previously leased assets, and eliminating past-due payables to Fairfield (collectively, the "**Fairfield Transaction**"). The Fairfield Transaction had a purported book value of $30 million. *See* Asset Purchase Agreement (the "**APA**"), a true and correct copy of which is attached hereto as **Exhibit 15**.

79.     In contrast, the TGS offer included $13 million in liquid cash with no additional contingencies, as the Fairfield Transaction included, and would further award the Company two new jobs, which would have provided a stream of income going forward, although the margins proposed may not have been as high as the Company preferred.  *See* Crowley Dep. Tr., 149:14–151:11.

80.     While on paper, the Fairfield Transaction appeared to provide greater value to the Company, of the transaction's $30 million value, only $8,688,185 in cash was actually paid—the remainder of the consideration was in the form of debt forgiveness and transfer of certain previously-leased recording units and equipment.  *See* APA, **Ex. 15**.

81.     Critically, the entire $8,688,185 in cash paid under the Fairfield Transaction would not actually go towards any future operating expenses of the Company—all of that cash was allocated to pay off a cash call on the Revolving Credit Agreement.  *See* Crowley Dep. Tr., 104:20–105:3.

82.     Although Mr. First and Mr. Crowley were aware of the details of the bids for the MCL, Mr. Gates and Mr. Jones were only provided details of the Fairfield Transaction three days prior to the proposed closing of the APA.  *See* Email from Gary Jones to Ross Solomon and Larry First dated April 3, 2018, a true and correct copy of which is attached hereto as **Exhibit 16**.

83.     According to Mr. Jones, as of April 3, he only had received verbal explanations of the various bids for the MCL and Mr. Gates was frustrated with the lack of information about this critical sale.  *Id.*

84.     Only two days after this email from Mr. Jones to the Ascribe Board members, the Board held a meeting at which the Board Member Defendants unanimously voted to approve the Fairfield Transaction, even though the only Board members familiar with the full terms of all of

the bids were Larry First, David Crowley, and presumably Ross Solomon, given his ties to Ascribe. *See* Minutes of the Joint Meeting of the Boards of Directors for the Company, a true and correct copy of which is attached hereto as **Exhibit 17**.

85.     One day later, the Fairfield Transaction was finalized, and the APA executed on April 6, 2018.

86.     Because the Company elected to consummate the Fairfield Transaction, as opposed to accepting the TGS offer, the Company lost out on both projects that TGS was going to award the Company.  *See* Cieslewicz Dep. Tr., 119:10-22.

87.     Of note, the APA for the Fairfield Transaction includes several atypical provisions that clearly anticipate a looming bankruptcy filing by the Company.

88.     Specifically, Section 2.13 of the APA includes a representation by the Sellers[9] that "both before and immediately after consummation of the transaction shall be solvent" and further shall pay their debts and maintain property in excess of their liabilities and have adequate capital to carry on their business.  *See* APA, **Ex. 15** § 2.13.

89.     Further, Section 4.12 of the APA contained a "springing lien" provision, whereby a lien would arise in favor of Fairfield:

> to the extent, the sale and transfer of the Purchased Assets, or any economic benefit relating thereto, is directly or indirectly attacked, avoided, or otherwise affected to the detriment of [Fairfield], through any action brought directly or derivatively, by or on behalf of the [Debtor] (including any creditor of the [Debtor]) after the closing.

*Id.* at § 4.12.

---

[9] The APA was by and among Fairfield and debtors Geokinetics Inc. and Geokinetics USA, Inc. (collectively the "**Seller**" under the APA).

90.     This "springing lien" provision is not common and was clearly drafted under the understanding that the attorneys for both sides recognized the likelihood of both a bankruptcy filing and a potential fraudulent transfer claim regarding the Fairfield Transaction.

      **e.**  **During the Negotiation of the Fairfield Transaction, Ascribe Positioned Itself to Consolidate of Power over the Company and Effectively Become the Sole Beneficiary of the Fairfield Transaction.**

91.     As set forth above, the Company was party to two pre-petition secured financing facilities, the Revolving Credit Agreement and the Term Loan.  Both facilities were governed by the Intercreditor Agreement.

92.     In late 2017 and early 2018, in connection with the sale of the MCL, the Company entered into several Amendments to the Revolving Credit Agreement.  The first of these, Amendment 7 to the Revolving Credit Agreement dated December 15, 2017, approved the Company's request to sell the MCL and included a broad release of all claims the Company could have against its lenders, including Ascribe and GCM.  *See* Amendment 7 to the Loan and Security Agreement, attached hereto as **Exhibit 18**.

93.     On January 29, 2018, the Company and Wells Fargo executed Amendment 8 to the Revolving Credit Agreement.  Under this agreement, Wells Fargo provided the Company a loan advance in the principal amount of $6,000,000.00.  *See* Amendment 8 to the Loan and Security Agreement, attached hereto as **Exhibit 19**.

94.     On February 14, 2018, the Company and Wells Fargo executed Amendment 9 to the Revolving Credit Agreement, which provided for an additional $5,000,000 term loan advance from Wells Fargo to the Company.  *See* Amendment 9 to the Loan and Security Agreement, attached hereto as **Exhibit 20**.

95.     Then, on April 6, 2018—the same date that the Fairfield Transaction was executed—the Company executed Amendment 10 to the Revolving Credit Agreement.  Under this Amendment, the sole lenders under the Revolving Credit Agreement, assigned their respective loan and commitments under the Revolving Credit Agreement to Ascribe.  *See* Amendment 10 to the Loan and Security Agreement, attached hereto as **Exhibit 21**.

96.     Through the assignment memorialized by Amendment 10, Ascribe became 100% owner of and administrator to the Revolving Credit Agreement.

97.     So, on April 6, 2018, when the Fairfield Transaction closed, the payment that was to be made to Wells Fargo to pay down the cash call on the Revolving Credit Agreement was paid directly to Ascribe.

98.     Accordingly, Ascribe obtained all of the cash consideration paid for the MCL, the Company's largest asset.  The purpose for selling the MCL—the Company's most valuable asset—was to obtain liquidity to address its chronic and deepening liquidity crisis. However, the Fairfield Transaction actually provided no liquidity to the Company whatsoever, but did provide a payout of more than $8 million to its largest equity holder, Ascribe, who now had sole authority to bind all secured parties under the Intercreditor Agreement and dictate the terms of any future funding needs of the Company.

99.     The Board did not ever approve a direct payment to either Wells or Ascribe through either the Board Resolutions approving the Fairfield Transaction or the Fairfield APA.  *See* **Exs. 15 & 17**.

100.    Less than three months after the Fairfield Transaction was approved and payment was made to Ascribe, the Company filed for chapter 11 protection.

**f.** **Gates Consistently Placed His Interests as Shareholder Ahead of his Duties as Board Member.**

101.    Throughout his tenure on the Board, Mr. Gates only ever focused on how the actions of the Board would affect his position as a shareholder of the Company.

102.    Mr. Gates was never actively involved in oversight of the Company's actions, but would occasionally interject through curt, pointed emails to Mr. Crowley inquiring about how certain actions would affect Gates's investment.

103.    For example, in July 2016, Michael Muse, the Company's CFO sent a list of key Company initiatives to the Board Members, to which Mr. Gates responded, inquiring about factoring certain accounts receivables.  *See* **Ex. 10** (Emails dated July 11, 2016).  When Mr. Muse provided a response, Mr. Gates's short retort was "We are opposed to these type [sic] of arrangements.  **It further destroys equity value.**" *Id.* (emphasis added).

104.    In March of 2018, Mr. Gates requested a Board meeting from Mr. Crowley.  In explaining his reasoning for the request, he explained that "a CEO has a responsibility **to all shareholders** to keep them informed." *See* **Ex. 12**.

105.    Critically, although Mr. Gates was not getting sufficient information to make informed decisions as a member of the Board, his only concern in not obtaining accurate updates was because of how it affected his position as a shareholder.

106.    Most alarmingly, in December of 2017, when the Company was stretched thin due to (a) its ongoing liquidity crisis reaching a critical stage, (b) increased troubles in Brazil, and (c) a significant marketing project to sell the MCL after other attempts to raise capital failed, Mr. Gates unilaterally invoked his registration rights as the second largest shareholder to force the Company to initiate an initial public offering.  *See* Crowley Dep. Tr. 112:1-13; email from Gary

Jones to David Crowley dated December 10, 2017, a true and correct copy of which is attached hereto as **Exhibit 22**.

107.   Mr. Crowley described this mandate as "nonsensical" and an "exercise in futility" that the Company couldn't do anything to stop because there was a "backdrop of lenders . . . treating seismic like a toxic opportunity and at the same time [the Company is] going to file an S-1 because [it's] going to go to the market . . . ."  Crowley Dep. Tr. 112:18–113:4.

   **g.   Treatment of the Company Brazil's Winddown.**

108.   In the weeks leading up to the filing of the Bankruptcy Case, the Board met to discuss, among other things, Geophysical do Brasil Ltda ("**GOK Brazil**"), one of the Company's subsidiaries, and its ongoing contract in Brazil with Rosneft Brasil E&P Ltda ("**Rosneft**").

109.   Because of the impending bankruptcy and the Company's liquidity crisis, it was clear that the Brazilian project with Rosneft would need to be abandoned.

110.   In response to this crisis, the Board convened on June 18, 2018 to discuss the different evacuation scenarios for its employees working in Brazil and the costs under each scenario, including the necessity of paying severance pay, the plan to evacuate everyone out of the area and abandon equipment (including explosives), and demobilizing the base camp.  The Board acknowledged that the operations in Brazil were in crisis and that GOK Brazil no longer had any fuel, helicopters, catering, or medical services.

111.   Despite the Board's acknowledgment of the dire situation created by GOK Brazil's lack of funds and its potentially dangerous effects on GOK Brazil's employees and the environment, Ascribe would not agree to provide any funding towards the winding down of GOK Brazil's operations.

112.    Indeed, Mr. First suggested at the meeting that the Company simply work under the contract with Rosneft "until the money runs out."  *See* **Ex. 14**.

113.    Mr. Crowley responded that this tactic would be acting in bad faith under the terms of the Contract. *Id.*

114.    Further, the situation was critical, as the project was in a stage where explosives were being placed.  Mr. First's suggested approach would have potentially resulted in GOK Brazil's employees having to evacuate the work site with live dynamite left behind.

115.    Furthermore, during the winddown process, including the termination of GOK Brazil's employees, the Board intentionally misled GOK Brazil's employees that upon termination, they could file claims in the Bankruptcy Case in order to receive unpaid compensation as of the Petition Date, while the Board was fully aware that the employees of GOK Brazil were not employees of the Debtors and would therefore not be entitled to any distribution from the Debtors' estates.

   **h.  <u>Ascribe Dictated Questionable Results in the Bankruptcy Case.</u>**

116.    As the Company was ultimately preparing for bankruptcy, it engaged with SAExploration Holdings, Inc. ("**<u>SAE</u>**" or "**<u>Stalking Horse Bidder</u>**") about a possible merger.

117.    Despite these talks, SAE and the Company were unable to agree upon terms under which a merger could be explored going forward and, as a result, the Company's only option was to file for bankruptcy protection.

118.    During the discussions with SAE, the Company's liquidity position continued to deteriorate, as it had been doing since 2016.

119.    In June 2018, preparations were undertaken to file for bankruptcy protection under chapter 11 of the Bankruptcy Code.

27

120.     In the weeks leading to the Petition Date, the Company faced an immediate liquidity crisis while still attempting to negotiate the terms of a sale with SAE, now anticipated to be through a potential 363 sale in bankruptcy.

121.     To provide the resources required to prepare a stalking horse bid from SAE and arrange for debtor-in-possession ("**DIP**") financing, Ascribe agreed to provide funds under a bridge loan agreement (the "**Bridge Financing**") in order to provide a smooth transition into the Bankruptcy Case.

122.     Because of the interested nature of the Conflicted Members, the Company made decisions throughout the Bankruptcy Case that drastically improved the positions of both Ascribe and Gates, to the detriment of the Company.

123.     Ascribe negotiated and received extensive and comprehensive releases from the Company regarding all potential claims the Company may have against Ascribe in connection with the issuance and approval of debtor-in-possession financing arrangement.

124.     Furthermore, under Ascribe's direction, the Company's Plan excluded GOK Brazil from the winddown reserve, for which approximately $28,000 had been proposed to be allocated.

125.     Ascribe's decision to exclude GOK Brazil from the Plan's winddown reserve subjected the Company to approximately $8.8 million in potential liabilities, all for the sake of $250,000 in saved cash collateral to Ascribe.

### i.     The Company's D&O Insurance Coverage.

126.     The Individual Defendants are insured under the following insurance policies held by the Insurers: (1) Navigators Insurance Company, Policy CH12DOL603362IV (the "**First Primary Policy**"); (2) ANV Global Services, Inc., Policy ANV118267A (the "**Second Primary Policy**"; (3) Pioneer Underwriters, Policy IFP-0000254-01; (4) Starstone Specialty Insurance

Company, Policy B86978180ASP; (5) and QBE Specialty Insurance, Policy QPL0850032 (each of the Pioneer, Starstone, and QBE Policies, a "**Second Excess Policy**," and collectively, the "**Second Excess Policies**" and together with the First Primary Policy and the First Excess Policy, the "**Policies**").  True and correct copies of the Policies are attached hereto as **Composite Exhibit 23**.

127.    The First Primary Policy covered the time from November 16, 2012 through May 10, 2013, when the First Primary Policy was converted to a "run-off" Policy due to the First Bankruptcy Case.

128.    The Second Primary and Second Excess Polices apply to all "Claims" arising after May 10, 2013. "

129.    The Second Primary and Second Excess Polices define "Claims" to include any "written demand for monetary or other legal relief made against any Insured."

130.    Second Primary and Second Excess Polices define "Insured" as an "Insured Person and the Company," and the term "Insured Person" includes "Directors and Officers" of the Company.

131.    The aggregate coverage under the Second Primary Policy is $10,000,000.  Each Claim under the Second Primary Policy has a limit of $5,000,000.

132.    The Second Excess Policies each have a limit of $5,000,000.

133.    The claims set forth in this Complaint fall within the coverage of all of the Policies. The actions of Ascribe and GCM and their respective Board Member Defendants during the First Bankruptcy and their initial acts to take three of the Company's five Board seats fall within the coverage of the First Primary Policy.

134.    All allegations arising after the First Bankruptcy Case fall within the coverage of the Second Primary Policy and Second Excess Policies.

135.    By letters dated March 28, 2019, the Insurers and Individual Defendants were sent a Demand for payment of money based on the Plaintiff's investigation of the wrongful acts discussed herein.  A true and correct copy of the March 28, 2019 letter is attached hereto as **Exhibit 24**.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty of Loyalty Against Individual Defendants)

136.    Plaintiff hereby incorporates each preceding paragraph as though fully set forth herein.

137.    As board members and officers of the Company, each of the Individual Defendants owed the Company and its stockholders a fiduciary duty of loyalty.

138.    The fiduciary duty of loyalty required each of the Individual Defendants to place the interests of the Company above their own interests when making decisions on behalf of the Company.  The Individual Defendants were required to, among other things, exercise their authority on an informed basis in the good faith pursuit of maximizing the value of the Company for the benefit of all of its equity holders, to act in the best interests of the Company, and to not use their positions as officers and board members to further their own self-interests or engage in any self-dealing.

139.    The Individual Defendants are not entitled to protection of the "business judgment rule" when the facts as pled state a plausible claim that the Individual Defendants were not disinterested and/or that they breached any one of the duties of loyalty, due care or good faith.

140.    As alleged herein, the Individual Defendants have breached their duty of loyalty by, among other things, placing their own interests above the interests of the Company and its other equity holders.  Among other things, the Individual Defendants engaged in certain wrongful acts and omissions in connection with (i) transactions in which the Conflicted Members were conflicted; (ii) the pursuit of strategic initiatives that placed interests of GCM and Ascribe ahead of the financial interests of the Company and which placed the Company at financial risk based primarily on the influence of these Conflicted Members; (iii) filling multiple board seats with persons with direct, financial interests in Ascribe and GCM; (iv) failing to ensure that adequate resources were available for the winddown of international operations; (v) approving the Fairfield Transaction over an alternative offer from TGS that would have provided direly needed liquidity to the Company and two new lines of business, whereas the Fairfield Transaction only provided cash to Ascribe; (vi) the failure to implement adequate risk management controls over the Company's debt-allocation strategies and the failure to heed the warnings and/or recommendations of disinterested members when confronted with such strategies; and (vii) failing to file for chapter 11 protection at the end of 2017 when the Company could have reorganized as a going concern— all of which collectively combined to deepen the insolvency of the Company and exposed it to excessive risk and substantial losses.

141.    As alleged herein, the wrongful acts of the Individual Defendants in violation of their fiduciary duty of loyalty to the Company further include the alleged failure of the Individual Defendants to assess the risk associated with the Company's investment and debt strategy, their failure to provide adequate oversight and supervision of the Company's decisions regarding incurring questionable debt, as well as their lack of knowledge and/or attention to Company's commercially suspect borrowing decisions and failure to timely address and/or alter these

strategies and policies to protect the Company from loss as its financial condition increasingly deteriorated.

142.    The Individual Defendants' actions and omissions, particularly with regard to the Fairfield Transaction, made while the Company was in the penumbra of insolvency and then insolvent, make Defendants liable not only to the Company and its stockholders but also to its creditors now affected by the Bankruptcy Case.

143.    As a direct and proximate cause of the Individual Defendants' breaches of their fiduciary duty of loyalty, as alleged herein, Plaintiff is substantially unable to recover funds in a meaningful amount but for the Individual Defendants' actions.

144.    As detailed herein, the Individual Defendants' breaches of the fiduciary duty of loyalty, and resulting damages, losses, liabilities and expenses are the result of gross negligence and/or willful misconduct by the Individual Defendants.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty of Good Faith Against Individual Defendants)

145.    Plaintiff hereby incorporates paragraphs 1–135 as though fully set forth herein.

146.    As board members and officers of the Company, each of the Individual Defendants owed the Company and its stockholders the fiduciary duty of good faith.

147.    As board members and officers, the Individual Defendants are not entitled to protection of the "business judgment rule" when the facts as pled state a plausible claim that the Board Member Defendants and Officer Defendants were not disinterested and/or that they breached any one of the duties of loyalty, due care or good faith.

148.    The Individual Defendants failed to act in accordance with their duty of good faith owed to the Company and its stockholders by engaging in a course of conduct that improperly benefited Ascribe and Gates at the expense of the Company and its stockholders.

149.    As alleged herein, the Individual Defendants have breached their duty of good faith by, among other things, placing their own interests above the interests of the Company and its stockholders.  Among other things, the Individual Defendants engaged in certain wrongful acts and omissions in connection with (i) transactions in which the Conflicted Members were conflicted; (ii) the pursuit of strategic initiatives that placed interests of GCM and Ascribe ahead of the financial interests of the Company and which placed the Company at financial risk based primarily on the influence of these Conflicted Members; (iii) filling multiple board seats with persons with direct, financial interests in Ascribe and GCM; (iv) failing to ensure that adequate resources were available for the winddown of international operations; (v) approving the Fairfield Transaction over an alternative offer from TGS that would have provided direly needed liquidity to the Company and two new lines of business, whereas the Fairfield Transaction only provided cash to Ascribe; (vi) the failure to implement adequate risk management controls over the Company's debt-allocation strategies and the failure to heed the warnings and/or recommendations of disinterested members when confronted with such strategies; and (vii) failing to file for chapter 11 protection at the end of 2017 when the Company could have reorganized as a going concern— all of which collectively combined to deepen the insolvency of the Company and exposed it to excessive risk and substantial losses.

150.    As alleged herein, the wrongful acts of the Individual Defendants in violation of their fiduciary duty of good faith to the Company further include the alleged failure of the Individual Defendants to assess the risk associated with the Company's investment and debt strategy, their failure to provide adequate oversight and supervision of the Company's decisions regarding incurring questionable debt, as well as their lack of knowledge and/or attention to the Company's commercially suspect borrowing decisions and failure to timely address and/or alter

these strategies and policies to protect the Company from loss as its financial condition increasingly deteriorated.

151.    The Individual Defendants' actions and omissions, particularly their approval of the Fairfield Transaction, made while the Company was in the penumbra of insolvency and then insolvent, make the Individual Defendants liable not only to the Company and its stockholders but also to its creditors now affected by the Bankruptcy Case.

152.    As a direct and proximate cause of the Individual Defendants' breaches of their fiduciary duty of good faith, as alleged herein, Plaintiff is substantially unable to recover funds in a meaningful amount but for the Individual Defendants' actions.

153.    As detailed herein, the Individual Defendants' breaches of the fiduciary duty of good faith, and resulting damages, losses, liabilities and expenses are the result of gross negligence and/or willful misconduct by the Individual Defendants.

### THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty of Care Against Individual Defendants)

154.    Plaintiff hereby incorporates paragraphs 1–135 as though fully set forth herein.

155.    As board members and officers of the Company, each of the Individual Defendants owed the Company and its stockholders the fiduciary duty of care.

156.    The fiduciary duty of care required Individual Defendants to use that amount of care that an ordinary, prudent person in like circumstances would have exercised, and to consider all material information that was reasonably available while making decisions on behalf of the Company.

157.    As board members and officers, the Individual Defendants are not entitled to protection of the "business judgment rule" when the facts as plead state a plausible claim that the

34

Board Member Defendants and Officer Defendants were not disinterested and/or that they breached any one of the duties of loyalty, due care or good faith.

158.    Not only did the Individual Defendants fail to act with care, they also acted with gross negligence and reckless indifference to and in deliberate disregard of their fiduciary responsibilities to the Company and its stockholders.

159.    As alleged herein, the Individual Defendants have breached their duty of care by, among other things, placing their own interests above the interests of the Company and its stockholders and failing to use that amount of care that an ordinary, prudent person in like circumstances would have exercised.  Among other things, the Individual Defendants engaged in certain wrongful acts and omissions in connection with (i) transactions in which the Conflicted Members were conflicted; (ii) the pursuit of strategic initiatives that placed interests of GCM and Ascribe ahead of the financial interests of the Company and which placed the Company at financial risk based primarily on the influence of these Conflicted Members; (iii) filling multiple board seats with persons with direct, financial interests in Ascribe and GCM; (iv) failing to ensure that adequate resources were available for the winddown of international operations; (v) approving the Fairfield Transaction over an alternative offer from TGS that would have provided direly needed liquidity to the Company and two new lines of business, whereas the Fairfield Transaction only provided cash to Ascribe; (vi) the failure to implement adequate risk management controls over the Company's debt-allocation strategies and the failure to heed the warnings and/or recommendations of disinterested members when confronted with such strategies; and (vii) failing to file for chapter 11 protection at the end of 2017 when the Company could have reorganized as a going concern—all of which collectively combined to deepen the insolvency of the Company and exposed it to excessive risk and substantial losses.

160.    Additionally, the Individual Defendants failed to provide accurate and complete information and disclosures to the Board regarding (i) the financial condition of the Company, (b) the adequacy and effectiveness of the Company's internal controls over financial accounting and reporting, (c) the adequacy and effectiveness of the systems, procedures, and personnel in place to enable the Company to properly account for and accurately report on the financial condition of the Company, and (d) the details of the Fairfield and TGS offers for the MCL, leading to an improper and ultimately fatal sale of the MCL to Fairfield in exchange for no added liquidity to the Company.

161.    As alleged herein, the wrongful acts of the Individual Defendants in violation of their fiduciary duty of care to the Company further include the alleged failure of the Individual Defendants to assess the risk associated with the Company's investment and debt strategy, their failure to provide adequate oversight and supervision of the Company's decisions regarding incurring questionable debt, as well as their lack of knowledge and/or attention to the Company's commercially suspect borrowing decisions and failure to timely address and/or alter these strategies and policies to protect the Company from loss as its financial condition increasingly deteriorated.

162.    The Individual Defendants' actions and omissions, particularly with respect to the Fairfield Transaction, made while the Company was in the penumbra of insolvency and then insolvent, make the Individual Defendants liable not only to the Company and its stockholders but also to the Company's creditors now affected by the Bankruptcy Case.

163.    As a direct and proximate cause of the Individual Defendants' breaches of their fiduciary duty of care, as alleged herein, Plaintiff is substantially unable to recover funds in a meaningful amount but for the Individual Defendants' actions.

36

164.     As detailed herein, the Individual Defendants' breaches of the fiduciary duty of care, and resulting damages, losses, liabilities and expenses are the result of gross negligence and/or willful misconduct by the Individual Defendants.

## FOURTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty)

165.     Plaintiff hereby incorporates paragraphs 1–135 as though fully set forth herein.

166.     To the extent that any Individual Defendant might be found not to have had a fiduciary duty to the Company at the time of the actions complained of herein, each such Individual Defendant is nevertheless liable for having aided and abetted the breach of fiduciary duties by one or more of the other Individual Defendants possessing such duties at the relevant times.

167.     As alleged herein, each non-fiduciary Individual Defendant substantially assisted, knowingly participated in, benefited from, and aided and abetted the breaches of fiduciary duties engaged in by the other Individual Defendants.

168.     As a direct and proximate result of this improper conduct, Plaintiff is substantially unable to recover funds in a meaningful amount but for the Individual Defendants' actions.

169.     As detailed herein, the non-fiduciary Individual Defendants' aiding and abetting of the other Individual Defendants' breaches of the fiduciary duties of care, loyalty, and good faith and resulting damages, losses, liabilities and expenses are the result of gross negligence and/or willful misconduct by the Individual Defendants.

## FIFTH CAUSE OF ACTION
### (Corporate Waste)

170.     Plaintiff hereby incorporates paragraphs 1–135 as though fully set forth herein.

171.     As board members and officers of the Company, each of the Individual Defendants owed the Company and its stockholders a duty to protect and prudently use the Company's assets.

The Individual Defendants are charged with not wasting those assets by engaging in an exchange that is so one-sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.

172.    The Fairfield Transaction, whereby the Individual Defendants approved the transfer of the Company's most valuable asset in the days leading up to the Petition Date in exchange for less than a third of its actual value and by which only Ascribe, and not the Company, obtained any cash proceeds, had no rational business purpose and was so commercially unreasonable that no business person of ordinary sound judgment could believe that the Company received adequate consideration in exchange for the transfer.

173.    Indeed, given the likelihood of an imminent bankruptcy filing on the heels of the Fairfield Transaction, which was evidenced by the "springing lien" provision included in the APA, the "consideration" provided to the Company in the form of debt forgiveness was effectively valueless, as the Company would not be operating in the near future due to the fact that the primary purpose of the sale of the MCL—that the Company obtain cash to address its liquidity crisis—was not achieved through the Fairfield Transaction.

174.    The Company, including its stockholders and creditors, were materially damaged by the Fairfield Transaction and the waste and mismanagement by the Individual Defendants in voting to approve it.

## SIXTH CAUSE OF ACTION
### (Civil Conspiracy)

175.    Plaintiff hereby incorporates paragraphs 1–135 as though fully set forth herein.

176.    Each of the Individual Defendants conspired with each other in an effort to perpetuate, facilitate, and aid and abet the breaches of fiduciary duty and other wrongs alleged herein.

177.    The Individual Defendants undertook substantial overt acts in furtherance of the conspiracies alleged herein and are liable for the damages and harm to the Company, as well as its stockholders and creditors.

178.    Specifically, the Board Member Defendants and Officer Defendants agreed to and allowed the questionable operation of the Board.  The Board's *modus operandi* was that Ascribe would dictate all corporate decisions, provide the Board Member Defendants with scant notice of the decision, and then have the other Board Member Defendants sign off on unanimous written consents of these actions without being properly informed.  Indeed, even where certain Board Member Defendants raised questions about the merits of a proposed plan of action proposed by Ascribe, they would nevertheless vote in favor of it.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment against the Conflicted Members)

179.    Plaintiff hereby incorporates paragraphs 1–135 as though fully set forth herein.

180.    The Conflicted Members were unjustly enriched for the reasons set forth herein.

181.    The Ascribe Board Member Defendants were able to use their position of power over the Company to coordinate a system whereby Ascribe would benefit, both monetarily and through broad releases of liability, to the detriment of the Company.

182.    GCM was benefitted by Gates's actions in consistently putting his role as shareholder ahead of his position a board member.  In doing so, and in connection with the Ascribe Board Member Defendants, the Board was operated as a "shareholder committee" and not a governing body.

183.    The unjust enrichment of the Conflicted Members was inequitable and in violation of fundamental principles of justice, equity and good conscience.

39

184.     By reasons of the foregoing, the Conflicted Members have been unjustly enriched at the expense of the Company, its stockholders, its creditors, and the Liquidating Trustee.

185.     Accordingly, the Company's estates are entitled to restitution.

**EIGHTH CAUSE OF ACTION**
**(Lender Liability against GCM)**

186.     Plaintiff hereby incorporates paragraphs 1–135 as though fully set forth herein.

187.     GCM was a substantial shareholder and lender to the Company.  Beyond being a lender, GCM exerted substantial control over the Company's affairs and strategies by controlling a seat on the Board.

188.     As a lender and, combined with Ascribe's board seats, the controlling majority on the Board, the Lender Defendant owed a fiduciary duty of care to the Company to act in the Company's best interests.

189.     Rather than exerting its power in a manner that would benefit the Company, the Lender Defendant manipulated its position of power to force the Company into making strategic decisions that benefitted the Lender Defendant while leaving the Company to flounder.

190.     The Lender Defendant, by joining with Ascribe, was able to influence the Board by threatening to withhold critical funding for projects unless the other Board Member Defendants acquiesced to the Lender Defendant's wishes.  These actions led to numerous problems, including (i) approving the Fairfield Transaction over an alternative offer from TGS that would have provided direly needed liquidity to the Company and two new lines of business, whereas the Fairfield Transaction only provided cash to Ascribe; (ii) failing to implement adequate risk management controls over the Company's debt-allocation strategies and failing to heed the warnings and/or recommendations of disinterested members when confronted with such strategies;

and (iii) failing to file for chapter 11 protection at the end of 2017 when the Company could have reorganized as a going concern.

191.    Additionally, the Lender Defendant acted primarily in its capacity as a shareholder at all times while on the Board.  In this role, the Lender Defendant forced the Company to waste time preparing a potential initial public offering in December of 2017 when the Company was dealing with multiple pressing liquidity issues and was trying to market and sell the MCL.

192.    As a direct and proximate cause of the Lender Defendant's breaches of its fiduciary duty of care, as alleged herein, Plaintiff is substantially unable to recover funds in a meaningful amount but for the Individual Defendants' actions.

193.    As detailed herein, the Lender Defendant's breaches of the fiduciary duty of care, and resulting damages, losses, liabilities and expenses are the result of gross negligence and/or willful misconduct by the Lender Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a jury to try this case and bring judgment against all Defendants as follows:

a)    Determining and awarding to the Plaintiff the damages sustained by the Company as a result of the breaches of the fiduciary duty of loyalty set forth above from each of the Individual Defendants, jointly and severally;

b)    Determining and awarding to the Plaintiff the damages sustained by the Company as a result of the breaches of the fiduciary duty of good faith set forth above from each of the Individual Defendants, jointly and severally;

41

c)      Determining and awarding to the Plaintiff the damages sustained by the Company as a result of the breaches of the fiduciary duty of care set forth above from each of the Individual Defendants, jointly and severally;

d)      Determining and awarding to the Plaintiff the damages sustained by the Company as a result of the aiding and abetting violations set forth above from each of the Individual Defendants, jointly and severally;

e)      Determining and awarding to the Plaintiff the damages sustained by the Company as a result of the corporate waste attributable to the Individual Defendants, jointly and severally;

f)      Determining and awarding to the Plaintiff the damages sustained by the Company as a result of the civil conspiracy attributable to the Individual Defendants, jointly and severally;

g)      Declaring that the Conflicted Members were unjustly enriched by the Fairfield Transaction and other interested transactions approved by the Board and Officers and award the Plaintiff the damages sustained by the Company attributable to the Conflicted Members, jointly and severally;

h)      Determining and awarding to the Plaintiff the damages sustained by the Company as a result of the lender liability violations attributable to the Lender Defendant;

i)      Awarding pre-judgment and post-judgment interest to Plaintiffs;

j)      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees, costs, and expenses;

k)      Granting such other and further relief as the Court deems just and proper.

Dated: June 24, 2020                    Respectfully submitted,

                                        */s/ Mark T. Clouatre, Esq.*
                                        **Mark T. Clouatre, Esq.**
                                        *Of Counsel*
                                        Texas State Bar No. 00793521
                                        Colo. State Bar No. 29892
                                        **Nelson Mullins Riley & Scarborough LLP**
                                        1400 Wewatta Street, Suite 500
                                        Denver, Colorado 80202
                                        Telephone:  (303) 583-9900
                                        Facsimile:  (303) 583-9999
                                        Email:   mark.clouatre@nelsonmullins.com

                                        -and-

                                        **NELSON MULLINS RILEY &
                                        SCARBOROUGH LLP**
                                        Shane G. Ramsey (*application forthcoming*)
                                        John T. Baxter (*application forthcoming*)
                                        150 Fourth Avenue, North, Suite 1100
                                        Nashville, TN  37219
                                        Phone:  (615) 664-5355
                                        Facsimile: (615) 664-5399
                                        E-Mail:   shane.ramsey@nelsonmullins.com

                                        -and-

                                        Frank B.B. Knowlton (*application forthcoming*)
                                        Federal Bar No. 02379
                                        E-Mail: frank.knowlton@nelsonmullins.com
                                        1320 Main Street/ 17th Floor
                                        Post Office Box 11070 (29211)
                                        Columbia, SC  29201
                                        (803) 799-2000

                                        **COUNSEL TO MARK E. HOLLIDAY,
                                        LIQUIDATING TRUSTEE**